601 A.2d 1133

**Delmar William PATRICK, III**

v.

**STATE of Maryland.**

**No. 729 Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Feb. 27, 1992.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore, and John L. Scarborough, State's Atty. for Cecil County, Elkton, on the brief), for appellee.

Submitted before BISHOP, ALPERT and ROSALYN B. BELL, JJ.

ALPERT, Judge.

On September 17, 1990, the grand jury for Cecil County, Maryland charged Delmar William Patrick, III, appellant,[1] with the murder of Earline Renee Brown.[2] In addition, on December 4, 1990, the State's Attorney for Cecil County brought a criminal information against Patrick. The information included four counts: (1) attempted first degree rape; (2) attempted second degree rape; (3) attempted sexual offense in the first degree; and (4) attempted sexual offense in the second degree.[3] On the same day, the State's Attorney informed Patrick that he sought a sentence of "Imprisonment for Life Without the Possibility of Parole" in the murder case. Judge Cole consolidated both cases for purposes of a motion to suppress hearing and for trial. On December 10, 1990, Patrick filed a demand for bill of particulars in case # 90601C (the murder case). The State

---

1. Patrick also goes by the name Ricky.

2. *State v. Patrick*, Cecil County, case # 90601C.

3. *State v. Patrick*, Cecil County, case # 90769C. Originally, the indictment and the information listed September 2, 1990 as the date the alleged offenses took place. At a hearing on Patrick's motion to suppress, held on February 5, 1990, Judge Donaldson C. Cole, Jr., allowed the State to correct the date.

did not respond until the day of trial. *See* discussion, *infra* part V.

Judge Edward D.E. Rollins, Jr., presided over a jury trial during March 18–20, 1990. The jury convicted Patrick of first-degree felony-murder and found him not guilty of first degree premeditated murder.[4] On May 8, 1991, Judge Rollins heard and denied Patrick's motion for a new trial. Judge Rollins then conducted a sentencing hearing. After hearing the parties' positions, Judge Rollins sentenced Patrick to the "jurisdiction of the Department of Corrections for the remainder of his natural life without benefit of parole." The very next day, Patrick appealed to this court.

On appeal he raises the following questions:

I. Did the trial court err in its instructions to the jury?

II. Did the trial court err in admitting into evidence testimony relating to a previous act of misconduct by Appellant?

III. Did the trial court err in refusing to compel the State to disclose to the defense the reports of an expert consulted by the State?

IV. Did the trial court err in permitting a forensic chemist called by the State to testify to her conclusion that only one of her findings was "significant[?]"

V. Did the trial court err in refusing to require the State to prepare a bill of particulars respecting the alleged sexual offenses?

Patrick and the victim, thirteen-year-old Earline Renee Brown (Earline), lived in a subsidized housing project located in Port Deposit, Maryland. Patrick knew Earline, in fact, Patrick and Earline's step-brother Steven Goodwin were best of friends.

On the evening of September 1, 1990, Earline's family noticed that she was missing. Late that night/early the next morning of September 2, searchers located Earline's

---

**4.** Judge Rollins instructed the jury to disregard the other counts if it found Patrick guilty of either first degree murder or felony murder.

body in a wooded area. Her uncle was the first to sight her body; he immediately called out to the other searchers. Earline's body rested some fifty feet from the apartment where Patrick lived with his parents and brother.

Earline's body was partially clothed when found. According to the assistant medical examiner, the "pathological diagnosis, meaning the summation of injuries, number one, is strangulation; number two, blunt force injury to the head; number three, cutting and stab wounds of torso; number four, contusion of tongue...." He determined the "[c]ause of death was strangulation and blunt force injuries to the head." There was also evidence of injury to the vaginal area.

Based upon the testimony of witnesses who placed Patrick and Earline in close proximity to each other prior to her death, the police questioned Patrick about Earline's murder. He gave the police several different versions of what happened.[5] His descriptions of the events before Earline's death closely corresponded to the injuries found upon her body. Furthermore, the forensic chemist for the State determined that bloodstains found on Patrick's shoes could have come from Earline—but not Patrick.

---

**5.** September 2, 1990, 1006 hours: Patrick tells sergeant Cole and troopers Perrot and Pierce that the last time he saw Earline was around 6:30 p.m. to 6:45 p.m. on September 1, 1990. After leaving his company, she went to the pay phone across the street.

September 3, 1990, first statement of the day: Patrick basically repeats (handwrites) his September 2nd story.

September 3, 1990, second statement of the day: Patrick's mother Mary Patrick and troopers Mitchell and Pierce are present. Officer Mitchell challenges the truthfulness of Patrick's story. Patrick then graphically recounts how Eric Davis killed Earline.

September 3, 1990, 1537 hours: Patrick tells the troopers that Davis murdered Earline around 6:50 p.m.

September 3, 1990, 1912 hours: Patrick sticks to the Davis story.

September 3, 1990: Upon learning that Davis's account of his activities is "checking out," Patrick admits that Davis was not involved with the murder. The troopers subsequently arrest Patrick.

September 19, 1990: Patrick summons troopers Perrot and Pierce to the Queen Anne County Detention Center. There, in the presence of the troopers and his counsel, he changes his story and implicates Earline's step-brother Steven as the murderer.

At trial, Patrick took the stand and told the jury that he did not kill Earline; he came across the body when he went into the woods behind his house, but he was "too scared" to tell anyone what he had seen.

## I.

Patrick argues that the trial court erred when it instructed the jury on the elements of first degree rape and first degree sexual offense. In addition, he complains because the court refused to instruct the jury on assault and battery and did not allow that charge on the verdict sheet.

Patrick cites to certain pages from the trial transcript wherein the court defines the attempted rape and attempted sexual offense charges. He points out that the court failed to define fully the elements of first degree rape and first degree sexual offense. He is concerned that the jury could have concluded that he "was guilty of first-degree rape or first-degree sex offense if he had engaged in the aggravating conduct *alone:* using a weapon, inflicting strangulation, and so on."

The trial court mentioned the aggravating factors that underlie each charge,[6] but forgot to define the terms rape (first degree) and sexual offense *contemporaneously* with the relevant instructions. At first glance, Patrick's contentions appear tenable, but upon closer examination, they cannot stand.

The State posits that Patrick *failed* to object and inform the lower court that it forgot to define the word rape contemporaneously with the first degree attempted rape charge. Furthermore, Patrick did not object to the lower court's instructions on attempted sexual offenses. Accordingly, our review is governed by Md.Rule 4–325(e).

> **Objection.**—No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury,

---

6. The information charged only attempted crimes.

stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any *plain error* in the instructions, material to the rights of the defendant, despite a failure to object.

(Emphasis added). *Sims v. State*, 319 Md. 540, 549, 573 A.2d 1317 (1990) ("Unless the attorney preserves the point by proper objection after the charge, or has somehow made it crystal clear that there is an ongoing objection to the failure of the court to give the requested instruction, the objection may be lost.").

If the defendant timely objects, the lower court has the opportunity to "correct any misstatement of law, clarify an ambiguity, or correct inaccuracies" in its instructions. *Leatherwood v. State*, 49 Md.App. 683, 694–95, 435 A.2d 477 (1981). Patrick had the "duty of stating distinctly at the time the specific grounds of objection." *Brown v. State*, 203 Md. 126, 129–30, 100 A.2d 7 (1953). He shirked his responsibility.

In *State v. Foster*, 263 Md. 388, 397, 283 A.2d 411 *cert. denied*, 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1971), the Court of Appeals stated, "It is a well established rule that when objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." [7] In accord with this instruction, although not obliged to do so, we examine the jury instructions in their entirety.

We have the discretion to recognize, *sua sponte,* plain error. *State v. Daughton*, 321 Md. 206, 210–11, 582 A.2d 521 (1990).

---

7. These words are relevant to the instant case. Patrick has not misconstrued the court's instructions, he has, however, omitted the court's subsequent correction of the attempted sexual offense instructions.

### A.

The lower court began its instruction on the rape charge as follows:

[THE COURT:]  Now, first degree rape, I have to give you a definition of what these are for you to be able to consider whether the person attempted to do them.  And I might say at this point that the attempt to rape or attempt to rape [sic], the person has to be living when you make the attempt.  You can't rape a dead person.  You can't commit a sexual offense against a dead person.  So, part of the proof is that when and if these attempts were made, the victim was alive at the time that the attempts were made.

In order to convict of first degree rape in this case, attempted first degree rape, the State must prove that:

. . . .

The court went on to list the aggravating factors for first degree attempted rape (*e.g.*, attacker used or displayed a dangerous weapon).  Later, while instructing the jury on second degree attempted rape, the court gave a specific definition of rape.

[THE COURT:]  Second degree rape, in order to prove that, attempted second degree rape, and these are all attempts I say, doesn't mean the actual act takes place, but they have to attempt to have committed it.  That's a common law offense.  The State has got to prove the Defendant attempted to have vaginal intercourse with the victim; that the act was committed by force or threat of force; that the act was committed without the consent of the victim.

Vaginal intercourse means the penetration of the penis into the vagina.  The slightest penetration is sufficient and emission of semen is not required.

■  With this instruction in mind, we disagree with Patrick when he claims that the jury could have concluded that he was guilty of (attempted) first degree rape based upon

aggravating conduct alone. There was no reversible error, let alone "plain error."

The information against Patrick listed attempted crimes— not completed crimes (*e.g.,* rape). The State did not have to prove penetration because, as the trial court stated, "You can't rape a dead person." Moreover, as the State indicates, the presence of force and the absence of consent were undisputed.

Even if we considered the trial court's contemporaneous omission (with the first degree attempted rape instruction) of the definition of the term "rape" to be erroneous, it did not create the *type* of prejudice that precluded Patrick from receiving an impartial trial. *Trimble v. State,* 300 Md. 387, 397, 478 A.2d 1143 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985) ("we shall examine the circumstances at the time of the court's instructions to determine if the court's omission was prejudicial"); *see State v. Hutchinson,* 287 Md. 198, 202–03, 411 A.2d 1035 (1980).

## B.

The *State* objected to the jury instructions because, among other things, the lower court failed to define the term "sexual act." Patrick did not object to this omission.

MR. SCARBOROUGH [FOR THE STATE]: I'd like the whole sexual act thing read.

THE COURT: I didn't do that?

MR. SCARBOROUGH: You just read the first part. There's the second part.

THE COURT: Okay. I'll give that.

The court kept its word.

[THE COURT:] I talk[ed] about first and second degree sexual act. Maybe I better, sexual act means, among other things, cunnilingus, fellatio, analingus, anal intercourse. Sexual act also means the penetration, however slight, by any object into the genital or anal opening of another person's body, if the penetration can be reason-

ably construed as being for the purposes of sexual arousal or gratification or for abuse of either party and if the penetration is not for accepted medical purposes.

The lower court cured its omission by giving supplemental instructions which included the definition of sexual act. Thus, the lower court linked the aggravating conduct for each attempted sexual offense charge with the crux of each offense.

We hold that the trial court's instructions on the attempted sexual offense charges did not amount to error, let alone plain error. *England and Edwards v. State*, 21 Md.App. 412, 427, 320 A.2d 66 (1974) ("If jury instructions when read as a whole, clearly set forth the applicable law, there is no reversible error."). *See also State v. Daughton*, 321 Md. 206, 210–11, 582 A.2d 521 (1990); *Austin v. State*, 90 Md.App. 254, 600 A.2d 1142 (1992).

## C.

At trial, Patrick took exception to the lower court's "failure to instruct the jury on the offenses of assault and battery, and to include them on the verdict sheet." Mrs. Murray, Patrick's co-counsel, informed the lower court of the exceptions.

MRS. MURRAY: Next I want to make an exception to the fact that categories for the following crimes are not included on the verdict sheet, that would be assault, battery.... ... There's evidence supporting those ... crimes. Assault and battery merge into murder. Every murder includes both an assault and a battery as a character of the actual crime. I think that belongs on the verdict sheet.

. . . . .

Okay. Next I'd like to except that the instructions for assault and also for battery were not given. Those belong in the verdict sheet and they belong in the instructions as well.

Patrick now argues that the "exception was meritorious, and the [court's] refusal to place those offenses before the jury was error." He cites *Hagans v. State*, 316 Md. 429, 559 A.2d 792 (1989), and *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989), in support of his contention.

In *Hagans*, the Court of Appeals adopted the majority rule on uncharged lesser included offenses. After reviewing other states' law, the Court chose to follow the principle that "a defendant, charged with a greater offense, can be convicted of an uncharged lesser included offense...." *Hagans*, 316 Md. at 447, 559 A.2d 792.[8] Ordinarily, the trial court should invoke the doctrine when *either* side requests or affirmatively agrees to the instruction. *Hagans*, 316 Md. at 455, 559 A.2d 792. The Court of Appeals concluded that

> where the State enters a nolle prosequi as to an uncharged lesser included offense, or where the charging document is drawn so as necessarily to exclude the lesser included offense, it would obviously be inappropriate to submit the lesser included offense to the jury, except to the extent that the defendant desires and is entitled to have it submitted under the principles recently set forth in *Hook v. State, supra.*

*Hagans*, 316 Md. at 455, 559 A.2d 792.

In *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989), the Court discussed the harm flowing from the prosecutor's *nol pros* of a lesser included crime, which, in effect, left the jury with a Hobson's choice[9]—convict or acquit. Noting that the United States Supreme Court doctrine dealt with capital cases, the Court of Appeals decided to "apply the fairness concept as to lesser included offenses to encompass

---

**8.** Two limitations attach to the doctrine: (1) the "elements test" applies, that is, all the elements of the lesser included offense must be included in the greater offense; and (2) the maximum penalty for the uncharged lesser offense must not be greater than that of the charged offense. *Hagans*, 316 Md. at 448–53, 559 A.2d 792.

**9.** *Hook*, 315 Md. at 38 n. 18, 553 A.2d 233.

noncapital cases." *Hook*, 315 Md. at 43, 553 A.2d 233. Accordingly, the Court stated that

> [w]hen the defendant is plainly guilty of some offense, and the evidence is legally sufficient for the trier of fact to convict him of either the greater offense or a lesser included offense, it is fundamentally unfair under Maryland common law for the State, over the defendant's objection, to *nol pros* the lesser included offense. The same rationale, set forth in detail *supra*, that supports the Supreme Court rule supports this view. In short, it is simply offensive to fundamental fairness, in such circumstances, to deprive the trier of fact, over the defendant's objection, of the third option of convicting the defendant of a lesser included offense. And if the trial is before a jury, the defendant is entitled, if he so desires, to have the jury instructed as to the lesser included offense.

*Hook*, 315 Md. at 43–44, 553 A.2d 233.

We point out that *Hagans* and *Hook* involved prosecutorial trial strategy. The prosecutors' decision to *nol pros* the lesser charges placed the defendant in a difficult situation. Thus, the Court of Appeals fettered the prosecutors' broad discretion by subjecting it to the strictures of fundamental fairness.

In the instant case, the strategic scenario is quite different. The State presented all of its charges to the jury. The State did not *nol pros* any charges in an attempt to apply pressure on the jury.

We agree with Patrick when he contends that "assault and battery were lesser-included offenses of virtually every other crime with which Appellant was charged." Nevertheless, we do not agree that the lower court's actions amounted to error.

In *Jackson v. State*, 322 Md. 117, 586 A.2d 6 (1991), the appellant took a position similar to Patrick's. The criminal information against Jackson charged him with possession of cocaine with intent to distribute; possession of cocaine; conspiracy to distribute cocaine; conspiracy to possess co-

caine with the intent to distribute; and conspiracy to possess cocaine. *Jackson,* 322 Md. at 123, 586 A.2d 6. The State, over Jackson's objection, did not submit the possession counts (lesser included) to the jury. *Jackson,* 322 Md. at 123–24, 586 A.2d 6.

Jackson, relying on *Hook,* in part, argued that "if there is legally sufficient evidence for the trier of fact to convict a defendant of the lesser included offense, that offense must go to the jury." *Jackson,* 322 Md. at 127, 586 A.2d 6. The Court of Appeals viewed Jackson's assertion as a question of evidentiary sufficiency. *Jackson,* 322 Md. at 127, 586 A.2d 6. Apparently, Jackson based his contention upon language from *Hook,* 315 Md. at 43, 553 A.2d 233, quoted in *Fairbanks v. State,* 318 Md. 22, 25, 566 A.2d 764 (1989),

> [w]hen the defendant is plainly guilty of some offense, and the evidence is legally sufficient for the trier of fact to convict him of either the greater offense or a lesser included offense....

In resolving the issue against Jackson, the *Jackson* Court stated that

> [e]ven when there is evidence that would support a finding of guilt of the lesser included offense, the State is not precluded from entering a nolle prosequi of that offense if, under the particular facts of the case, there exists no rational basis by which the jury could conclude that the defendant is guilty of the lesser included offense but not guilty of the greater offense. Under the facts of this case, there simply was no rational basis upon which the jury could have concluded that Jackson was guilty of possession [the lesser included] but not guilty of possession with intent to distribute [the greater].

*Jackson,* 322 Md. at 127–28, 586 A.2d 6. The Court cautioned that its "holding is not to be interpreted as reaching beyond ... [the] factual scenario" of the case. *Jackson,*

322 Md. at 128, 586 A.2d 6.[10]

We do not seek to extend *Jackson's* holding to the case *sub judice*, rather, we look to that case for the "rational basis" test. On the facts before the jury, there was *no* rational basis upon which it could have concluded that Patrick was guilty of assault and battery (the lesser included) but not the greater charged offenses.

Assuming, *arguendo*, that Patrick's testimony at trial was factually correct, he would not have been guilty of any crime. He testified that he happened upon Earline's body by accident. In addition to his description of his activities, Patrick repudiated the statements he gave to the police in which he implicated Eric Davis and Steven Goodwin. The State argues that if the jury chose to believe those accounts, it could have found Patrick guilty as an accomplice. Thus, we concur with the State when it posits, "There is no reasonable theory, on the facts of this case, which would permit convictions of just assault and battery. Therefore, instructions on those offenses were not required."

## II.

Patrick asserts that the lower court committed prejudicial error by allowing Stephanie Osborne to testify about Patrick's prior conduct towards Earline. Osborne was a classmate of Earline's. During the summer of 1990, prior to Earline's murder, Osborne spent time at Port Deposit.

On direct examination, Osborne told the jury what she had heard Patrick say to Earline.

Q  Tell us what you heard Ricky say to Earline.

A  Couple of times I heard him say things like she had a nice body and a nice butt.

---

**10.** The circumstances of the case were "that a primary offense and a lesser included offense were charged. The State, over objection, nol prossed the lesser included offense." *Jackson,* 322 Md. at 128, 586 A.2d 6.

In its brief, the State did not inform us that the Court of Appeals limited the *Jackson* holding.

Later, Scarborough asked Osborne if she had ever seen Patrick touch Earline.

> MR. SCARBOROUGH: Did you ever see him touch Earline?
>
> MR. KLENK [PATRICK'S CO–COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: I've seen him pinch her butt before.
>
> BY MR. SCARBOROUGH:
>
> Q  Pinch her butt?
>
> A  Yeah.
>
> Q  Is that during that summer [of 1990]?
>
> A  Um-hum.

■ Patrick goes on to argue that "[f]or a male to 'pinch the butt' of a female is obviously a crime—a sexual offense and a battery."[11]  He believes that Osborne's testimony was not probative and depicted him "as a nasty, undisciplined person with a willingness to violate the rights of others."

The State points out that "while it may be a sexual offense or battery to pinch someone, it patently is so only where the person pinched does not consent." *Taylor v. State,* 214 Md. 156, 159, 133 A.2d 414 (1957); *King v. State,* 36 Md.App. 124, 134, 373 A.2d 292, *cert. denied,* 281 Md. 740 (1977).  The record herein does not tell us whether there was a lack of consent.  The absence of evidence of lack of consent would obviously present an insufficiency of evidence of crime.  Thus, there was no "other crimes evidence."

■ We move on to consider whether Osborne's testimony was relevant to the charges against Patrick.  We conclude that it was.

---

**11.** According to article 27, § 464C(a)(1):
A person is guilty of a sexual offense in the fourth degree if the person engages:
(1) In sexual contact with another person against the will and without the consent of the other person....

We noted in *Baldwin v. State,* 56 Md.App. 529, 537, 468 A.2d 394 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218 (1984), that "the real test of admissibility of evidence in a criminal case is the connection of the fact proved with the offense charged." Upon reviewing the trial testimony, we are convinced that the State offered Osborne's testimony to disclose Patrick's sexual affinity for Earline.

### III.

Patrick contends that the trial court erred when it refused to compel the State to disclose the results of polygraphs conducted by trooper James Mitchell. Patrick cites to Md.Rule 4–263(b)(4) which requires the State, upon request, to provide the reports and statements of experts to the defendant.

*Reports or Statements of Experts.*—Produce and permit the defendant to inspect and copy all written reports or statements made in connection with the action by each expert consulted by the State, including the result of any physical or mental examination, scientific test, experiment, or comparison, and furnish the defendant with the substance of any such oral report and conclusion[.]

He contends that the plain language of the rule permits the discovery of polygraph results. Specifically, he asserts that "a polygraph exam is obviously a 'scientific test.'" Therefore, because Md.Rule 4–263(b)(4) does not require that evidence be admissible before it is discoverable, Patrick claims, in a roundabout way, that the polygraph results would have aided him in preparing for his trial.

The State, on the other hand, argues that "polygraph results are of such questionable scientific reliability as to be inadmissible as evidence in criminal cases in Maryland, they cannot be considered scientific tests or experiments for the purposes of Rule 4–263(b)(4)."

The lower court examined the polygraph materials and determined that the State had provided Patrick with all the exculpatory items found therein. Accordingly, the lower

court refused to compel the State to provide Patrick with non-exculpatory polygraph material.

.I'm going to deny your motion for discovery as far as reports of the polygraph exam because they are irrelevant in the case. They are not admissible anyway.

■ Counsel has not cited, nor have we found, a Maryland decision which answers the question before us: *Are non-exculpatory polygraph results discoverable under Md.Rule 4–263(b)(4)?* For the reasons that follow, we hold that they are *not* discoverable.

At the outset of this discussion, we alert the reader to the distinction between *results* and *tests.* The distinction appears facile, nevertheless, authors sometimes gloss over it. For example, tests may be scientific, but the results may be unreliable.

■ Maryland law *is* settled on whether polygraph results are admissible as evidence—they are not. In *Johnson v. State,* 303 Md. 487, 513, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), the Court of Appeals declared, "There is no longer any doubt that in this State, the results of a lie detector test, as well as the fact of taking such a test, are inadmissible at trial." [12] The Court added, "While the better practice would be to delete all reference to polygraph tests, by whomever and whenever made, the admitted reference in this case does not warrant reversal." *Johnson,* 303 Md. at 514, 495 A.2d 1. In no uncertain terms, the Court has indicated that there is to be no *intentional* discussion of polygraph results at trial.

Finding no published decision interpreting the particular aspects of Md.Rule 4–263(b)(4) before us, we turned to a search of the rule's history. That search did not reveal anything of substance.

---

**12.** For a thorough discussion of the polygraph admissibility question, see *Akonom v. State,* 40 Md.App. 676, 394 A.2d 1213 (1978), *cert. denied,* 284 Md. 741 (1979); *State v. Biddle,* 599 S.W.2d 182 (Mo.1980) (en banc).

In *Jennings v. State*, 303 Md. 72, 492 A.2d 295 (1985), the Court of Appeals undertook an investigation of Md.Rule 741 (the precursor to Md.Rule 4–263). The earliest rule adopted by the Court of Appeals under its constitutional rulemaking power which provided for criminal discovery was Rule 5, found in Part Four, I, of the Criminal Rules of Practice and Procedure (1951). *Jennings*, 303 Md. at 79–80, 492 A.2d 295. Rule 5 did not address scientific tests.[13] Effective January 1, 1957, Rule 5 was renumbered Md.Rule 728. *Jennings*, 303 Md. at 80, 492 A.2d 295. Maryland Rule 728 was a replica of old Rule 5. *Jennings*, 303 Md. at 80, 492 A.2d 295. Maryland Rule 728 was revised, along with Chapter 700, in the Twentieth Report of the Rules Committee. *Jennings*, 303 Md. at 80, 492 A.2d 295. Maryland Rule 728 did not address scientific tests either. Eventually, the Rules Committee revised Md.Rule 728 and renumbered it Md.Rule 741. *Jennings*, 303 Md. at 83, 492 A.2d 295. The language of Md.Rule 741(b)(4) is similar to Md.Rule 4–263(b)(4).[14]

None of the material in the Rules Committee's files on Md.Rule 4–263, Md.Rule 741, and "Rule 700—General" di-

---

**13.** Rule 5 provided for the discovery and inspection of tangible materials.

> Upon motion of a defendant, the court, in any case pending before it, may order the State's Attorney to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, including written statements by the defendant, obtained from or belonging to the defendant or obtained from others by seizure or by process, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable.

**14.** Maryland Rule 741(b)(4) required the State to:

> Produce and permit the defendant to inspect and copy all written reports or statements made in connection with the particular case by each expert consulted by the State, including the results of any physical or mental examination, scientific test, experiment or comparison, and furnish the defendant with the substance of any oral report and conclusion made in connection with the particular case by each expert consulted by the State, including the results of any physical or mental examination, scientific test, experiment or comparison.

rected us to a definition of scientific test as delineated in Md.Rule 4–263(b)(4). Thus, we survey the law of jurisdictions which do *not* permit the discovery of non-exculpatory polygraph results.[15]

Federal Rule of Criminal Procedure (Fed.Rule) 16(a)(1)(D) is somewhat similar to Md.Rule 4–263(b)(4).

(D) Reports of Examinations and Tests.

Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

Federal Rule 16(a)(1)(D)'s last clause distinguishes it from Md.Rule 4–263(b)(4). Nevertheless, the Fed.Rule is relevant for our discussion because the Court of Appeals has barred intentional use of non-exculpatory polygraph materials at trial. *Johnson v. State,* 303 Md. 487, 513–14, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). Although the federal court system allows the limited use (unrelated to the substantive correctness of the results) of non-exculpatory polygraph materials at trial, *United States v. Miller,* 874 F.2d 1255, 1260–63 (9th Cir. 1989),[16] the defense has no right to discover those materials.

In *United States v. Feola,* 651 F.Supp. 1068, 1146 (S.D.N.Y.1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied sub nom. Marin v. United States,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989), the trial court denied the defen-

---

**15.** Our discussion is limited to cases which were decided after the United States Supreme Court handed down its decision in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**16.** The leading case is *Tyler v. United States,* 193 F.2d 24 (D.C.Cir. 1951), *cert. denied,* 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952).

dant's motion which sought "the results of any polygraph examination administered to anyone in connection with the Government's investigation of the case...." The trial court gave its reasons for denying the motion.

[T]his motion is denied with respect to the polygraph information, which this Court does not consider to be a "scientific test or experiment" within the contemplation of this rule in that its reliability has not been sufficiently established in the scientific community, and which is not otherwise discoverable under Rule 16.

See also *United States v. Recognition Equip., Inc.,* 711 F.Supp. 1, 15 (D.D.C.1989) (denying, without explanation, defendants' discovery request of polygraph examination).

Indiana does not allow for discovery of polygraph results. In *Zupp v. State,* 258 Ind. 625, 283 N.E.2d 540, 543 (Ind. 1972), the Court held:

We believe the rationale of the California Court [*Ballard v. Superior Ct.*] is applicable to the case at bar, i.e. that not only are the results of a lie detector test inadmissible (see annotation in 23 A.L.R.2d 1306) but that the results of the test would neither lead to any additional evidence nor aid the appellant in the preparation of his defense.

See also *Inman v. State,* 482 N.E.2d 451, 454 (Ind.1985) ("Counsel has made no attempt to show what use he would have made of the information revealed by the polygraph examination report.").

The defendant, in *State v. Gum,* 172 W.Va. 534, 309 S.E.2d 32, 40 (1983), asserted that the State's failure to give him questions asked and answered (by a witness) effectively limited his ability to prepare for trial. The Court found that the defendant had full access to the polygraph materials during an *in camera* hearing at trial, that none of the examinations (of the witness and the defendant) included exculpatory material, and that the lower court did not abuse its discretion by failing to require disclosure of the polygraph examinations.

Missouri does not permit discovery of non-exculpatory polygraph materials. In *State v. Greer,* 616 S.W.2d 82, 85 (Mo.Ct.App.1981), the court equated polygraph examinations with lay opinions on credibility.

In view of *Biddle* [*State v. Biddle,* 599 S.W.2d 182 (Mo.1980) (en banc) (polygraph examinations are inadmissible in Missouri) ], polygraph examinations are nothing more than a lay opinion of credibility. In that posture we can see no basis for compelling their disclosure or any prejudice to defendant in failing to receive them.

In *Ballard v. Superior Ct.,* 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838, 845 (1966) (en banc), the Supreme Court of California upheld a lower court ruling that denied the defendant's request for the results of a polygraph examination.

Defense counsel failed to offer any tenable reason to the trial court why he should be given the results ["Counsel stated to the trial court that he was interested in obtaining this information because the witnesses' answers to questions might be used for impeachment purposes"]; moreover, we cannot conceive of their pertinence to defendant's case. Not only is evidence of polygraph tests inadmissible, but the results of the test[s] would neither lead to any additional evidence nor aid petitioner in preparation for trial.

The Georgia Supreme Court affirmed a lower court decision that denied the defendant's request to see the results of a polygraph test that the defendant claimed was favorable to his case. *Nations v. State,* 234 Ga. 709, 217 S.E.2d 287 (Ga.1975). The Court stated that there was no Georgia statute or rule of practice which required the district attorney to open his files to the attorney for the accused, nor was the accused entitled as a matter of right to receive copies of police reports and investigation reports made in the course of preparing the case against him. *Nations,* 217 S.E.2d at 288 (quoting *Henderson v. State,* 227 Ga. 68, 179 S.E.2d 76, 84 (Ga.1970), *vacated in part,* 408 U.S. 938, 92 S.Ct. 2868, 33 L.Ed.2d 758 (1972) (death penalty)).

In *Commonwealth v. Gee,* 467 Pa. 123, 354 A.2d 875 (1976), the defendant complained because the Commonwealth did not turn over "every test, every result, every interview sheet that was taken in connection with that polygraph test." The material was exculpatory because it contained exculpatory statements made by the appellant—but it did not " 'extrinsically' tend to establish innocence or mitigate guilt." The results of the polygraph examination were inconclusive. Moreover, the defendant's statement appearing in the examination was similar to his prior informal and subsequent formal statement which were admitted into evidence. Therefore, the Court concluded that

> any additional evidence that he remained firm and consistent in his version of events at an intermediate time would clearly be minimal in light of the consistency already shown and should not be allowed to outweigh the danger of improper inferences arising from references to the polygraph examination.

*See also Commonwealth v. Aye,* 275 Pa.Super. 369, 418 A.2d 767, 768 (1980) ("The Commonwealth was not required to supply the testing data [from the polygraph examination to the defendant].").

In *State v. Winsett,* 57 Del. 344, 200 A.2d 237, 239 (1964), the Court distinguished between discoverable materials.

> The results of polygraph tests, blood tests, and fingerprint examinations, all excluded by Thompson [*State v. Thompson,* 50 Del. 456, 134 A.2d 266 (1957)], are developed factually by the police as investigators. This is to say that they are obtained by the police *qua* police in their investigation of crime. This kind of information, in its broadest sense, arises out of the analytical or investigative phase of police effort. It is the work product of detection, at least as distinguished from the mere gathering or collection of tangibles which could be done by anyone physically present at a given time and place.

Upon considering the preceding authorities, we have decided to follow the route taken by the court in *United States v. Feola, supra,* 651 F.Supp. 1068, 1146 (S.D.N.Y.

1987). Cognizant of the language in *Johnson v. State*, 303 Md. 487, 513–14, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), we conclude that a polygraph examination is *not* a scientific test for purposes of Md.Rule 4–263(b)(4).

Patrick has no special right to any non-exculpatory statements made by witnesses. *Carr v. State*, 284 Md. 455, 471, 397 A.2d 606 (1979). The main purpose of Md.Rule 4–263(b)(4) and its predecessors is to aid the defendant in the preparation of his case and to protect him from surprise. *Brown v. State*, 85 Md.App. 523, 528–29, 584 A.2d 164 (1991). The trial court conducted a hearing and determined that the polygraph materials at issue did *not* contain any exculpatory items. Under the principles enunciated in *Johnson v. State*, 303 Md. 487, 513–14, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), Patrick (and the State) could not *intentionally* use any of the polygraph materials.

In addition, as the Court in *State v. Winsett*, 57 Del. 344, 200 A.2d 237, 239 (1964), pointed out, polygraph examinations are akin to an investigative tool. The testing "game plan" may even be prepared by the prosecution. Thus, the work product doctrine may act as a bar to discovery. Md.Rule 4–263(b)(4).

## IV.

Patrick complains that the trial court erred by allowing the State's forensic chemist to testify about her conclusion regarding laboratory tests she had conducted. The State submitted Sharon DuBey as an expert in the examination of evidence for the presence of blood or other body fluids. Patrick did not object, and the court qualified DuBey as an expert in her field.

On the witness stand, DuBey told the jury about the evidence she tested, the tests she used, and the results of those tests. According to one test, Patrick is a PGM type

1+ 2— and Earline was a PGM type 1+ 2+.[17] DuBey explained to the jury that four stains (out of six) found on a pair of Patrick's sneakers matched up with Earline's PGM type.[18]

Q   [MR. SCARBOROUGH FOR THE STATE]   They [the stains on the sneakers] were just tested positive for blood?

A   4 stains tested positive, I'm sorry, 4 stains out of 6 that I found tested positive for human blood.   3 of those 4 were PGM type 1+ 2+.

THE COURT: 3 out of 4 positive for what?

THE WITNESS: For the PGM type 1+ 2+.

Q   3 out of the 4?

A   Yes.

Q   These would be the only blood results that would be *significant* for this case's purposes?   [Emphasis added.]

A   Yes.

MR. KLENK: I object to that.   I think that's a conclusion.

THE COURT: Overruled.

Patrick contends that "[t]his testimony was a clear invasion of the province of the jury, whose function it was to arrive at opinions and conclusions determining what evidence was 'significant' in the case."

In *Raithel v. State*, 280 Md. 291, 301, 372 A.2d 1069 (1977) (citations omitted), the Court of Appeals discussed the admissibility of expert testimony:

the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom consti-

---

17.   The test DuBey referred to is based on the electropheretic analysis of phosphoglucomates.   See Forensic Science Handbook 363–66 (Richard Safferstein ed. 1982); 2 Forensic Sciences §§ 29.04(c)(4), 29.05(c)(2)(i) at 29.32, 29.61–62 (Cyril H. Wecht ed. 1990).

18.   On cross examination, DuBey stated that the frequency of PGM type 1+ 2+ in the population is 21.6% for blacks and 22.8% for whites.

tute a ground for reversal. It is well settled, however, that the trial court's determination is reviewable on appeal, and may be reversed if founded on an error of law or some serious mistake, or if the trial court has clearly abused its discretion.

In *Vandegrift v. State,* 82 Md.App. 617, 634, 573 A.2d 56, *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990), we stated that "[a]n expert opinion is admissible even if it relates to an issue of ultimate fact, provided the opinion is of some aid to the trier of fact."

■ In the instant case, Patrick hones in on DuBey's use of the word "significant." DuBey's statement, considered in isolation from her other testimony, appears troubling. However, after reading that statement in context with her entire testimony, we conclude that the lower court did not abuse its discretion by allowing DuBey to testify to her conclusion.

DuBey's trial testimony was not as complex as her crime reports (which the trial court admitted into evidence). DuBey tested several pieces of evidence and reached conclusions as to each. She explained some of her tests and conclusions to the jury. The only blood test result that matched blood consistent with Earline's type to Patrick was the PGM test of blood found on Patrick's sneakers. Thus, DuBey's response, that these results were the only results significant for the case's purposes, takes on new meaning. DuBey clarified her use of the term "significant" during a discourse with Mr. Klenk, Patrick's co-counsel.

Q  Okay. Well, with respect to the first report that you prepared and analyzed all the clothing items that the State's Attorney's [has] just gone over, the razor knife, were any of the results on any of those items significant with respect to this case?

A  I'm not sure what you mean by significant. There was nothing found on the razor. There was blood found on the victim's clothing.

Q  That was consistent—

A   That was consistent with hers.

This colloquy establishes that DuBey used the term significant to describe any result which matched Earline's blood or body fluids with a piece of evidence—*not* as a description of the *only* test that was important to the case.

## V.

Patrick maintains that the lower court erred by refusing to require the State to provide Patrick with a bill of particulars with regard to the attempted sexual offenses. Yet, he fails to point out that he originally filed a demand for bill of particulars in his murder case (# 90601C), but *not* in his attempted sexual offenses case (# 90769C). Maryland Rule 4–241 is relevant to this discussion. It provides:

> Within 15 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213(c), the defendant may file a demand in circuit court for a bill of particulars. The demand shall be in writing, unless otherwise ordered by the court, and shall specify the particulars sought.

In addition to Md.Rule 4–241, Maryland Code, Article 27, § 461C specifically addresses situations in which a general form of information is used to charge a rape or a sexual offense.

> (a) In any indictment, information, or warrant charging rape or a sexual offense, it shall be sufficient to use a form substantially to the following effect: "That A–B on the.... day of ........, 19 ..., in the County (City) aforesaid did unlawfully commit a rape or sexual offense upon C–D, in violation of Article 27, Section (here state section violated), of the Annotated Code of Maryland; contrary to the form of the Act of Assembly in such case made and provided and against the peace, government and dignity of the State."

> (b) In any case in which this general form of indictment, information, or warrant is used to charge a rape or a sexual offense, the defendant is entitled to a bill of

particulars specifically setting forth the allegations against him.

On December 4, 1990, the State's Attorney used the general form of information to charge Patrick with four counts of attempted sexual offense.[19]  Patrick was entitled to a bill of particulars as a matter of law, *State v. Boozer*, 304 Md. 98, 113, 497 A.2d 1129 (1985)—yet he did not follow proper procedure.

The State did not respond to Patrick's demand for a bill of particulars for the murder charges until the day of trial.

[THE COURT:] Defense has now raised an issue on demand for bill of particulars which was filed previously in the case and the particulars demanded were as follows: One, the acts or conduct of the Defendant which constitute the offense charged under count 1.  Is that count 1 of the murder trial?

MR. KLENK: Yes, Your Honor.

THE COURT: The manner in which the Defendant is alleged to have committed the offense charged under count 1.  Mr. Scarborough, there wasn't an answer filed to this.  What is the State's—

MR. SCARBOROUGH: State's position is it's included in the indictment and we don't have to give the manner, means of that particularization request.  Given them the witnesses, we've given the date and the occurrence.

THE COURT: And what the particular offense is.

MR. SCARBOROUGH: That's right.

THE COURT: Mr. Klenk?

---

19. For example, the fourth count read as follows:
THE STATE'S ATTORNEY also presents that the aforesaid Defendant, on or about the aforesaid date, in the County aforesaid, did unlawfully attempt to commit a sexual offense in the second degree upon the aforesaid Victim.  Common Law.
THE STATE'S ATTORNEY further avers and alleges that the offenses charged hereinabove were committed contrary to the form and Acts of Assembly in such case made and provided, and against the peace, government and dignity of the State of Maryland.

MR. KLENK: Well, Your Honor, basically we are charged with a felony murder under count 1, which—

THE COURT: Which could be anything from first, second, manslaughter, not guilty.

MR. KLENK: And maybe not even there at the scene. I think that we are entitled to know exactly what he's done in order to defend the case.

THE COURT: Well, they've told you. They've told you that.

MR. KLENK: He's involved somehow in the death.

THE COURT: The child has been killed and he's the one accused of killing.

MR. KLENK: I think there's also the matter of—

THE COURT: They don't know any more than you do, if he did it, what his particular acts were because nobody was there. I don't think they can give you anything more at this point except the witnesses and you already know what evidence they do have by way of whatever statements and physical evidence, so I don't really think there's anything more they can give you.

Having disposed of the demand for bill of particulars on the murder charges, the court moved on to the next question.

MRS. MURRAY: We are entitled to go through the sex offenses. We have attempted first and second degree rape and then first and second degree sex offense. We are entitled to know what's being referred to there.

THE COURT: You know what's alleged to have been done to the body. I don't really think there's much more they can tell you at this point. That's why you have jury trials and Court trials. Somebody's got to determine if there is a sex offense and, if so, what it is and that's got to be determined by the facts as derived in the case.

MR. KLENK: I think we are entitled to know what the Defendant is alleged to have done, the particular acts and I think particularly again with respect to first degree rape, it can be anything from employs a danger [sic]

weapons [sic] to inflicts suffocation to threaten[s] or place[s] the victim in fear or whether it was committed by one or more other persons.

THE COURT: And you have to glean that from the circumstances of the death and I don't know what the evidence is going to produce, but I think all the State has to do is lay out the offense and what he's accused of having done and I think that's all they have to give you at this point. You have your objection.

The Court of Appeals, in *McMorris v. State*, 277 Md. 62, 70 n. 4, 355 A.2d 438 (1976), stated that "[t]he purpose of a bill of particulars is to guard against the taking of an accused by surprise by limiting the scope of the proof." According to *Boozer*, 304 Md. 98, 113, 497 A.2d 1129 (1985), and article 27, § 461C(b) of the Code, Patrick *was* entitled to a bill of particulars that specifically set out the allegations against him.[20] We use the past tense because Patrick did not timely file his demand for bill of particulars for the rape and sexual offense charges. In fact, he did not file a demand.

Maryland Rule 4–241(a) provides that the defendant may file a demand for bill of particulars "[w]ithin 15 days after the earlier of the appearance of counsel or the first appearance of the defendant...." We have not been shy to enforce this provision. In *Fraidin v. State*, 85 Md.App. 231, 270–71, 583 A.2d 1065 (1991), we held that a defendant who did not timely file a demand for bill of particulars had no entitlement to one. In that factual scenario (theft), the trial court had the discretion to compel the State to provide a bill of particulars.

---

**20.** Generally, the defendant complains about the State's failure to respond to a demand for a bill of particulars. The rule has no provision for sanctions. *Grant v. State,* 55 Md.App. 1, 30–31, 461 A.2d 524 (1983), *cert. denied,* 299 Md. 309, 473 A.2d 455 (1984); *see Polisher v. State,* 11 Md.App. 555, 587, 276 A.2d 102, *cert. denied,* 262 Md. 749, *and cert. denied,* 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971). The situation is left to the discretion of the trial judge. *Grant,* 55 Md.App. at 31, 461 A.2d 524. Dismissal may be an appropriate sanction. *State v. Mulkey,* 316 Md. 475, 490, 560 A.2d 24 (1989).

Article 27, § 461C makes the present circumstance differ-ent. The Legislature decided that a defendant is entitled to a bill of particulars if the general form of information is used to charge a rape or sexual offense. *State v. Mulkey,* 316 Md. 475, 489, 560 A.2d 24 (1989) ("This language [§ 461C(b)] indicates a mandatory, unqualified intent."). In *Mulkey,* the lower court granted Mulkey's motion to dis-miss the indictment and, thereby, ruled that his demand for bill of particulars was moot. *Mulkey,* 316 Md. at 488, 560 A.2d 24. The indictment against Mulkey charged him with child abuse and multiple sexual offenses. *Mulkey,* 316 Md. at 477–79, 560 A.2d 24. Mulkey, unlike Patrick, "filed a . . . demand for a bill of particulars." *Mulkey,* 316 Md. at 479, 560 A.2d 24.

The Court of Appeals reversed and remanded the case for the trial court to require the State to provide a bill of particulars, and then rule on the motion to dismiss the indictment in light of the information provided. *Mulkey,* 316 Md. at 489–90, 560 A.2d 24.

▮ Patrick should have followed the dictates of Md.Rule 4–241(a). His failure to follow proper procedure undercuts his position. If we were to ignore Md.Rule 4–241, the efficient administration of justice could run amuck. For instance, as in the present case, the defendant could wait until the day of trial and then make his demand. The State and the courts would be subject to the vagaries of the defendant's whim. Such a result would be absurd.

▮ Patrick's error of omission aside, the lack of a bill of particulars did not lead to his "surprise" during trial. The State had provided Patrick with all the relevant facts that it had concerning the manner and cause of Earline's death. That is why the lower court ruled against Patrick on this point.

THE COURT: They don't know any more than you do, if he did it, what his particular acts were because nobody was there. I don't think they can give you anything more at this point except the witnesses and you already know

what evidence they do have by way of whatever statements and physical evidence, so I don't really think there's anything more they can give you.

．　　　．　　　．　　　．　　　．

THE COURT: You know what's alleged to have been done to the body. I don't really think there's much more they can tell you at this point.

The court's language implies that the State would not have been able to clarify the charges in the information. Regardless of hypothetical situations, Patrick's failure to file timely a demand for bill of particulars is fatal to his argument. Moreover, the State provided him with the information that it had. Patrick suffered no harm.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.